# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

ROBERT PROSCH,

               Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

               Defendant.

OPINION AND ORDER

17-cv-41-wmc

      Claimant Robert Prosch seeks judicial review of a final decision of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, under 42 U.S.C. § 405(g), which denied his application for disability insurance benefits and supplemental security income. On June 18, 2018, the court held oral argument regarding claimant's contention that Administrative Law Judge Springer (the "ALJ") treated the opinion of Dr. Andrew Braun, claimant's treating physician, improperly. For the reasons discussed below, the court will affirm the Commissioner's decision.

## BACKGROUND

      Prosch stopped working on March 5, 2009, but began reducing his hours in 2007. (AR 138.) He initially sought disability insurance benefits and supplemental security income on October 8, 2009, alleging a disability onset date of January 1, 2007. (AR 137, 144.) While those applications were pending, he filed a new application for disability and disability insurance benefits on March 22, 2013. (*See* AR 654.) All applications were denied. (*See id.*) Claimant previously appealed the denial of his first application and that case was remanded by this court on March 30, 2015. (Dkt. #10 at 2.) The Appeals

Council then remanded the case to ALJ Springer, directing him to: (1) consolidate the remanded case with claimant's subsequent claim; (2) "give further consideration to the treating source opinion of Dr. Andrew Braun"; (3) "[o]btain updated and additional evidence concerning the claimant's impairments in order to complete the administrative record"; (4) further consider "the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record"; and (5) if appropriate, obtain clarifying evidence from a VE about "the effect of the assessed limitations on the claimant's occupational base." (AR 739.)

### A. Medical Record and Reports

Claimant is a diabetic with chronic knee, foot and back pain. (*See* AR 425, 434, 473, 476.) During the relevant period, his diabetes was mostly uncontrolled, and he also suffered from diabetic nephropathy and peripheral neuropathy. (*See* AR 425, 429, 439, 520, 531.) He also had retina problems in his right eye. (AR 322.) Most relevant to this appeal are the opinions of his treating physicians, Dr. Andrew Braun and Dr. Alexander Spitzer.

Dr. Braun was claimant's primary care physician. On November 19, 2010, he completed a Diabetes Mellitus RFC Questionnaire. (AR 505-509.) Braun explained that their treatment relationship had been ongoing for 3-4 years. At the time Braun completed the questionnaire, claimant had diabetes, hypertension, increased cholesterol, retinal detachment, neuropathy, and nephropathy, as well as a "fair, guarded" prognosis. (AR 505.) Braun listed claimant's symptoms as: difficulty walking; episodic vision blurriness; excessive thirst; swelling; sensitivity to light, heat or cold; retinopathy; kidney problems;

2

insulin shock/coma; extremity pain and numbness; loss of manual dexterity; frequency of urination; dizziness/loss of balance; and hyper/hypoglycemic attacks. (*Id.*) Dr. Braun opined that claimant's symptoms would frequently be "severe enough to interfere with attention and concentration."[1] (AR 506.) He further opined that claimant could tolerate low stress jobs, walk less than a single city block without rest or pain, and sit 20 minutes or stand 15 minutes at a time (standing/walking for less than two hours and sitting for about four hours in an eight-hour workday). (*Id.*)

Additionally, Braun thought claimant would need to walk around about every 20 minutes for approximately five minutes. (AR 507.) As a result, Braun opined that the claimant required a job permitting changing positions from standing/walking to sitting at will, and he would be expected to take unscheduled breaks about every 2 hours for about five minutes at a time. (*Id.*) Braun also opined that claimant could: rarely lift 10 pounds, occasionally lift less than that; never lift 20 or 50 pounds; rarely twist, stoop or climb stairs; and never crouch/squat or climb ladders. (AR 507-08.) Braun next proposed a number of environmental limitations for claimant, and estimated that claimant would be absent approximately three days a month. (AR 508.) Finally, Braun explained that the described symptoms and limitations were applicable for the prior year. (AR 509.)

In 2015, claimant began seeing Dr. Alexander Spitzer, a neurologist. On April 2, 2015, claimant told Spitzer about an incident in March where he unexpectedly "felt that he was passing out and fell to the floor and hurt his back . . . . He was then having difficulty regaining some consciousness and was struggling with carrying a case of CDs and was a bit

---

[1] "Frequently" is defined to mean "34% to 66% of an 8-hour working day." (AR 506.)

confused." (AR 1217.) Additionally, Spitzer noted claimant's foot numbness had reportedly worsened over the past six years. (*Id.*) Claimant told Spitzer that he was having "increasing ambulatory difficulty," as "he can barely get through 9 holes of golf, he has a lot of trouble walking and it requires a lot of effort. He feels very worn out and his feet hurt and he has difficulty continuing with ambulation." (*Id.*) Spitzer opined that "[i]n patients like [the claimant,] combined features of neuropathy and stenosis can be very difficult to evaluate on clinical exam alone" such that he felt "obligated to get some imaging of his lumbar and cervical spine." (AR 1220.)

Based on the imaging, Spitzer noted on April 23, 2015, that:

> [Spitzer] analyzed [the electrodiagnostic study] in terms of *the physiological significance versus the symptoms and I think this is not sufficient to be causing substantial disability such as ambulatory difficulty at this time*. It is, of course, always hard to judge the relationship between physiology and symptoms, but *generally patients with such extreme mild findings do not experience motor disability. Therefore*, I would estimate[] that the *neuropathy is not actually causing his symptoms*.
> * * *
> I do not know whether this type of condition would eventually at some time in the future possibly progress to a more severe situation . . . . I simply recommended, therefore, that we have periodic clinical followup and assessment.
> * * *
> The other problem identified today is the presence of some stenosis. . . . *It also would not match any of his symptoms or difficulties*.
> * * *
> [T]here is a disk protrusion at L5-S1 which is moderate. . . . Given his symptoms and his back problems and his neurogenic claudication, I am thinking that the imaging study and the physiology are showing us the problem but are slightly underestimating the severity in terms of his clinical symptoms.

(AR 1210-11 (emphasis added).)

On November 6, 2015, Dr. Spitzer further noted that claimant "does have some gait limitations but he can play 9 holes of golf instead of 18 holes." (AR 1173.) Spitzer explained that "[e]valuation so far has shown a mild to moderate disk herniation in the lumbosacral area . . . . He also has a very mild and borderline demyelinating neuropathy and on clinical grounds I have diagnosed an autonomic neuropathy. However, *all of these are very mild*." (*Id.* (emphasis added).) He added that the autonomic neuropathy did not require treatment, only that claimant "get up slowly." (*Id.*) As for the demyelinating neuropathy, he determined "intervention is not needed," and "it is mild enough that we could not call it CIPD [chronic inflammatory demyelinating polyneuropathy]." Similarly, he found the claimant's herniated disk to be "very mild and does not require intervention." (*Id.*)

On August 9, 2016, Dr. Spitzer wrote a follow-up letter describing his treatment of the claimant, noting that he "has been under my care for evaluation of a neuropathy." (AR 1251.) Spitzer then explained that "[t]here was clear definitive objective evidence of a neuropathy on the testing. The date of onset of the neuropathy cannot be determined from the testing alone and requires evaluation of the clinical history." (*Id.*) At the time he wrote the letter, Spitzer explained that "the likely diagnosis appear[ed] to be consistent with a neuropathy due to immune system problems," but that diagnosis was still being verified. (*Id.*) He added that claimant's neuropathic pain was being treated with medication and that "these cases generally do not have a specific external or environmental or other cause established and are considered 'idiopathic.'" (*Id.*)

5

## B. ALJ's Decision

As now the *third* ALJ to consider claimant's application, ALJ Springer found that the claimant's date last insured was September 30, 2013, and that he had no substantial gainful activity since January 1, 2007, which was his alleged onset date. (AR 657.) The ALJ next determined that claimant had three "severe impairments: diabetes mellitus with peripheral neuropathy, degenerative disc disease, and obesity," findings based "in large part upon the previous administrative decisions . . . and the evidence summarized therein." (*Id.*) Similarly, he found that claimant did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (AR 659.) Indeed, ALJ Springer concluded that "the District Court and the Appeals Council both implicitly accepted the validity of the findings by [his predecessors, ALJs] Hamel and Pleuss regarding severe impairments; the only issue actually in question was the amount of weight to be given to the opinion of Dr. Andrew Braun." (AR 657.)

As for the claimant's RFC, ALJ Springer determined that he had "a range of sedentary work," including lifting or carrying 10 pounds occasionally and less frequently; the ability to "stand and walk about four hours collectively and sit about six hours respectively as long as [he was] allowed to alternate between sitting and standing at will, provided that he would not be off task in excess of accepted employer tolerances." (*Id.*) Additionally, claimant could not

> climb ladders and scaffolding[,] but can occasionally stoop, crouch, kneel, balance, crawl, and climb ramps and stairs. He should avoid more than occasional exposure to temperature extremes and vibration; needs to avoid all exposure to hazards; and is limited to tasks that would allow him for being off task within accepted employer tolerances (up to ten percent of the

6

workday in addition to regular breaks).

(*Id.*)

In making these determinations, ALJ Springer acknowledged that claimant's primary care physician, Dr. Andrew Braun, had offered a conflicting opinion on November 19, 2010, but gave it "little weight." The ALJ reached this conclusion relying on the opinion of ALJ Pleuss[2] and the conclusion that Braun's opinion "appears quite strongly contradicted by the recently submitted clinical testing and the opinions of another treating physician, Dr. Spitzer." (AR 661.) Likewise, the ALJ added that "[t]here is no indication that Dr. Braun has any specific expertise or specialty entitling his opinion to greater weight than other treating or examining personnel while clinical testing of even recent date would fail to support such restrictions, let alone applying them back in 2009." (*Id.*) Accordingly, ALJ Springer determined, as had the two ALJs before him, that claimant could perform past relevant work as an order clerk, and thus he was not disabled. (AR 662-63.)

OPINION

Claimant raises four arguments on review by this court: (1) the ALJ failed to weigh the opinion of Dr. Braun properly as claimant's treating physician; (2) the ALJ improperly assessed plaintiff's RFC; (3) the ALJ improperly concluded that claimant could return to past work; and (4) the ALJ failed to follow this court's remand order. In one way or another, all four arguments concern the ALJ's treatment of Dr. Andrew Braun's opinion, which is encompassed in the RFC questionnaire that he filled out on claimant's diabetes

---

[2] ALJ Springer noted that "Judge Pleuss' decision did not come before the District Court as it was issued only three days before the remand order." (AR 661.)

7

in November 2010. (*See generally*, AR 505-09.) As previously discussed, Dr. Braun proposed fairly severe limitations for claimant: (1) could tolerate only low stress jobs; (2) would need to walk around roughly every 20 minutes for about five minutes; (3) would be expected to take unscheduled, five-minute breaks about every 2 hours; (4) his symptoms would frequently be "severe enough to interfere with attention and concentration"; (5) could sit 20 minutes or stand 15 minutes at a time -- and stand/walk for less than 2 hours a day and sit for about 4 hours; and (6) would miss about three days of work each month. (*Id.*)

In part relying on the decision of ALJ Pleuss, the ALJ gave this opinion "little weight" because: (1) "Dr. Braun was not the claimant's primary treatment provider," as claimant was "primarily seen by a nurse practitioner when at that clinic"; (2) Braun "identified and cited symptoms which were not in the medical record"; (3) he failed to provide an explanation for the proposed extreme limitations; (4) the proposed limitations were inconsistent with claimant's activity level; (5) nothing indicated Braun had "specific expertise or specialty entitling his opinion to greater weight"; and (6) "the opinion was also not consistent with nor supported by the evidence." (AR 661.) Nevertheless, claimant contends that the discounting of Braun's opinion and the failure to adopt his proposed limitations were improper.

Initially, claimant argues, the ALJ "mention[ed] the factors for evaluating a treating physician's opinion," but "fail[ed] to consider the factors that support the claimant's allegations of disability" by "cherry pick[ing]" the record and "incorporat[ing] by reference the analysis of prior decisions." (Dkt. #10 at 11, 13.) Claimant contends that this shows

the ALJ failed to follow this court's remand order, which directed the ALJ to evaluate the opinion of Dr. Braun properly. (*Id.* at 16.) Unsurprisingly, the government disagrees, arguing that "ALJ Springer explained his consideration of each of the regulatory factors when weighing Dr. Braun's opinion," so that he "both set forth his own independent analysis and referenced and adopted the analysis of ALJ Pleuss (whose decision the Court had not previously remanded)." (Dkt. #15 at 7.) The government further asserts that ALJ Pleuss found Braun's restrictions were not sufficiently explained (and were not consistent with claimant's activities), and ALJ Springer found claimant's own neurologist's observations brought Braun's opinions into question. Indeed, Dr. Spitzer opined that claimant's neuropathy would not cause the severe symptoms alleged. (*Id.* at 7-9.)

This dispute between Prosch's two principal treatment providers does not warrant remand, especially when the more recent and specialized opinions support the ALJ's findings. "An ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer 'good reasons' for declining to do so." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). That is what ALJ Springer did here, albeit in part by relying on ALJ Pleuss's analysis. Where a treating physician's opinion is not given controlling weight, a number of factors are considered to determine whether the appropriate weight was given. *See* 20 C.F.R. § 404.1527(d) (2009). These factors include: "[l]ength of treatment relationship and the frequency of examination"; "nature and extent of the treating relationship"; supportability; consistency; specialization; and "[o]ther factors . . . which tend to support or contradict the medical opinion." *Id.* § 404.1527(d)(2)-(6). As noted above, these factors were generally addressed

9

in the ALJ's opinion and supported by substantial evidence.

Looking at the factors, there is contradictory evidence in the record concerning the length of the treatment relationship. While claimant testified that Dr. Braun has been his primary care physician since 1997 or 1998 (AR 689), Braun indicated that he had been treating claimant since the mid-2000s (AR 505 (indicating a treating relationship of 3-4 years)). Regardless, Braun *did* treat claimant before and during the disability period. Next, looking at the frequency of examination, and the nature and extent of the treating relationship, claimant correctly points out that the ALJ failed to note: "Braun ordered testing and x-rays, referred the claimant to specialists, recommended physical therapy and diabetes education, had discussions with the claimant about his disease process management, and reviewed records from other providers," as well as "communicated with other providers," "performed regular examinations himself and reviewed examinations from other sources," and "saw the Plaintiff frequently and adjusted his medication as needed." (Dkt. #10 at 12.)

However, ALJs Pleuss and Springer appear to be correct that Braun was not claimant's primary treatment provider for his diabetes, as claimant saw nurse practitioners Jodi Strong and Stephanie Williams-White more often for diabetes management. (AR 661, 769.) Likewise, the nurse practitioners were primarily responsible for examining claimant, managing his medications, providing diabetes education and counseling, and reviewing his treatment from other sources. (*See e.g.*, AR 473 (Braun noting that claimant "is continuing to be managed through Stephanie White"); AR 482 (Braun noting that

claimant "was put on Gabapentin through Stephanie White").)[3]  ALJ Springer also noted that Dr. Braun did not have any special expertise to warrant his opinion getting greater weight. (AR 661.)

The real heart of the dispute, however, concerns supportability and consistency. ALJ Springer relies on ALJ Pleuss's finding that Dr. Braun identified symptoms not supported by the medical record. (*See* AR 661, 769.) While Braun identified many symptoms supported by the record -- such as hyper/hypoglycemic attacks, difficulty walking, frequency of urination, and extremity pain and numbness -- he also identified a number of symptoms that were not, including sensitivity to light, heat or cold, and loss of manual dexterity. (*See* AR 505.) Further, the ALJs both noted that Braun's limitations are contradicted by claimant's activities. About six months before Braun's assessment, claimant reported that he was "still . . . an avid golfer," who while having more difficulty

---

[3] Although not a basis for ALJ Springer's decision, the court also notes that the January 20, 2015, Diabetes Mellitus RFC Questionnaire completed by Nurse Strong differs from Braun's 2010 assessment in some significant respects. First, while Braun opined that claimant would need to take a five-minute break every hour, Strong opined he would need a 15-20 minute break once a week. She explained that the break would be necessary "to treat a low blood sugar." Second, Dr. Braun opined that claimant would have "good days" and "bad days," and that claimant would be absent approximately three days each month, while Nurse Strong opined that claimant's impairments would not produce good and bad days. Third, Strong opined that claimant could sit for an hour at a time, which is three times as long as the 20 minutes Braun suggested. Fourth, Strong approximated that claimant would need to walk around every hour, instead of every 20 minutes. Fifth, Strong did not think that claimant would need to elevate his feet. Sixth, the treatment providers identified different symptoms. Finally, the treatment providers differed in their assessment of the appropriate postural and environmental limitations. On the other hand, both medical professionals agreed that: (1) claimant's pain or other symptoms would "frequently" interfere with his attention and concentration; (2) claimant was only capable of "low stress" jobs; (3) claimant could walk no more than one city block; (4) claimant could stand/walk less than two hours and sit about four hours during a normal work day; and (5) claimant would need five-minute periods in which to walk around during the work day. (*See generally* AR 505-09, 1471-75.) Strong also opined that her RFC assessment would be effective for ">3 years" from January 2015. (AR 1475.)

"walk[ing] a full 18 holes," still carried his bag instead of using a cart. (AR 484.) A few months after Braun's opinion, claimant reported he began an exercise program. (AR 520.) By May of 2011, he was still working out a few times a week. (AR 513.) And as of July of 2011, he reported "walking 9 holes of golf multiple times a week" and "also working out." (AR 572.)

While claimant criticizes the ALJ's reference to his golfing as "cherry pick[ing]" and ignoring claimant's doctor's encouragement to be active, that doesn't seem to be the case.[4] Not only are the many references to claimant's golfing in the medical records an indication of their usefulness to gauge his levels of activity, the ALJ reasonably relied on claimant's continued contemporaneous reports of golfing as inconsistent with some of the extreme limitations Braun suggested, such as an inability to stand for more than 15 minutes or to walk a single city block.[5]

Claimant also objects to the failure of the ALJ to consider how Braun's opinion was consistent with claimant's allegations of pain. (Dkt. #10 at 14.) Claimant is correct that the record is replete with references to his pain, which could provide support for Braun's

---

[4] In fairness, claimant did report riding a cart while golfing in November 2010, presumably for 18 holes since he was still walking 9 holes some eight months later. (AR 538.)

[5] As ALJ Pleuss explained, Braun's proposed

> restrictions are extreme and inconsistent with later evidence of the claimant's physical activities, for example, the evidence in 2011 of the claimant walking 9 holes of golf multiple times per week, and working out. His opinion that the claimant could only occasionally lift less than 10 pounds and stand only 15 minutes at a time is clearly inconsistent with the claimant's golfing activities.

(AR 769.)

opinion that claimant's pain or symptoms would "frequently" be severe enough to interfere with claimant's concentration and attention. (AR 506.) Similarly, this may provide support for Braun's opinions about claimant's abilities to walk, sit and stand, the proposed postural limitations, and the number of workdays he would miss each month, but as noted, some of those limitations also seem to be contradicted by claimant's activity levels.

Most importantly, however, as noted by ALJ Springer, Braun's extreme limitations are contradicted by the opinions of Dr. Alexander Spitzer, claimant's neurologist in 2015-2016.[6] (*See* AR 661 (explaining that "clinical testing of even recent date would fail to support such restrictions, let alone applying them back in 2009" and that Braun's opinion "appears quite strongly contradicted by the recently submitted clinical testing and the opinions of another treating physician, Dr. Spitzer").) In particular, a 2015 record noted that Dr. Spitzer

> analyzed [the electrodiagnostic study] in terms of the physiological significance versus the symptoms and I think that this is not sufficient to be causing substantial disability such as ambulatory difficulty at this time. It is, of course, always hard to judge the relationship between physiology and symptoms, but generally patients with such extreme mild findings do not experience motor disability.

(AR 1210.) In that same note, Spitzer added "[t]he other problem identified today is the presence of some stenosis. . . . It also would not match any of his symptoms or difficulties."

---

[6] Claimant objects to the ALJ's reliance on evidence postdating claimant's date last insured, contending that "the ALJ specifically directed Mr. Prosch's attorney to direct questioning to the period of time before September 30, 2013 (the date last insured)." (Dkt. #10 at 13-14.) However, claimant overstates the record. The ALJ stated "while I appreciate knowing what the current status is, [what] I really need to be doing is working on that back status." (AR 691.) Counsel replied "I guess the relevant age is probably 66, then, when . . . he would have been switched over from SSD to SSR benefits. Nevertheless, I get your point[.]" (*Id.*)

(AR 1210-11.)

In November 2015, Spitzer also noted that claimant had "a mild to moderate disk herniation in the lumbosacral area," "a very mild and borderline demyelinating neuropathy," and "autonomic neuropathy," all of which he considered to be "very mild." (AR 1173.) Moreover, none of these ailments required treatment at that point. (*Id.*) This is a far cry from Braun's opinion that claimant would miss about three days of work each month.[7] Accordingly, Spitzer's medical notes and observations appear inconsistent with the extreme limitations proposed by Dr. Braun.[8] Considering how poorly controlled claimant's diabetes was through most of the disability period (and its impact on his other conditions), over time his capacity would, if anything, be expected to decrease and certainly not improve. (*See* AR 1417 (Strong Diabetes RFC Questionnaire describing claimant's prognosis as "no[] improvement, diabetes/complications will progress steadily over time.").)

In short, ALJ Springer's opinion is supported by substantial, if sometimes conflicting, evidence. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (explaining that "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (internal citation and quotation marks omitted)).

---

[7] In fairness, Dr. Spitzer did not discount at least the *possibility* that the claimant's limitations are greater than can be seen in a physical exam. Spitzer wrote: "Given his symptoms and his back problems and his neurogenic claudication, I am thinking that the imaging study and the physiology are showing us the problem but are slightly underestimating the severity in terms of his clinical symptoms." (AR 1211.) Spitzer arguably is not challenging the reality of claimant's symptoms, but only explains that his physical conditions present as mild.

[8] Further, as the ALJ noted, the 2016 consultative exam performed by Dr. Ward Jankus also "reflect[ed] a far greater exertional capacity than anything cited by Dr. Braun ten years ago." (AR 662.)

While the ALJ could certainly have found the claimant unable to work, in reviewing an ALJ's decision, this court is "not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Id.* As here, if "reasonable minds could differ," and the "ALJ's decision denying [claimant's] claims . . . is adequately supported," the court must affirm. *Id.* Indeed, if the court could examine the record with fresh eyes, the result might well be different; however, the ALJ's decision was adequately supported and the court must uphold it. Likewise, because the ALJ did not improperly discount Dr. Braun's November 2010 opinion, the ALJ neither erred by rejecting his additional proposed limitations nor by concluding that the claimant could return to his past work.

ORDER

IT IS ORDERED that the decision of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, denying Robert Prosch's application for disability benefits and supplemental security income is AFFIRMED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 9th day of July, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge